F#: 2006R01516
EK:JEG

**M-07 625**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

    - against -

ARI GOODMAN,

    Defendant.

- - - - - - - - - - - - - - - -X

UNDER SEAL

COMPLAINT AND AFFIDAVIT
IN SUPPORT OF APPLICATION
FOR ARREST WARRANT

(T. 18 U.S.C. § 1343)

EASTERN DISTRICT OF NEW YORK, SS:

    MICHAEL A. PETRONELLA, being duly sworn, deposes and says that he is a Special Agent with the Federal Bureau of Investigation ("FBI"), duly appointed according to law and acting as such.

    Upon information and belief, in or about and between July 2003 and August 2005, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant ARI GOODMAN, together with others, did knowingly and intentionally devise a scheme and artifice to defraud and did willingly and knowingly transmit and cause to be transmitted by means of wire communication in interstate commerce, writings, signs, signals and sounds for the purpose of executing such scheme.

    (Title 18, United States Code, Section 1343)

1

The source of your deponent's information and the grounds for his belief are as follows:[1]

1. I have been a Special Agent with the FBI for approximately two years. I am presently assigned to a unit dedicated to the investigation of Internet related crimes. I have undergone training concerning the investigation of wire fraud, access device fraud, and various frauds conducted using mobile phones, computers and the Internet.

2. I have participated in the investigation of this matter, and I am familiar with the information contained in this affidavit based on my own personal participation in the investigation, my review of documents, conversations I have had with other law enforcement officers about this matter, and my training and experience as an FBI agent.

INTRODUCTION

3. Generally, in order to accept credit cards, businesses establish "merchant accounts" with credit card companies. With respect to certain credit card companies, such as American Express, the merchant account can be created online without speaking to any person from the credit card company. The

---

[1] Because the purpose of this affidavit is to set forth only those facts necessary to establish probable cause, I have not described all the relevant facts and circumstances of which I am aware.

merchant provides contact and bank account information enabling American Express to deposit money into the merchant's bank account as credit card sales are processed. Once a merchant account has been established, American Express records a transaction using a credit card terminal, online credit card payment processor such as www.authorize.net, or by calling in the purchase. If the purchase is authorized, data regarding the sales transactions are maintained in the terminal until the "batch," or number of transactions, is closed by the merchant and transmitted to the credit card company's database.

    4. I have spoken with American Express concerning their methods of processing merchant transactions. The merchant's bank account is credited for all sales transactions directly by American Express, usually within 48 hours. If a cardholder later disputes a transaction, American Express generally credits the cardholder's account while it investigates the claim. The credit card company will then write to the merchant explaining the nature of the dispute and affording the merchant an opportunity to justify the disputed charge. If the merchant does not adequately refute the complaint, the credit card company debits the merchant's bank account for the amount in dispute in a process known as a "chargeback." Because customers usually do not dispute charges until after their monthly

statements are received, and the credit card company affords merchants adequate time to respond to disputes, chargebacks usually occur several months after American Express has credited the merchant's bank account for the initial purchase. If a merchant's account lacks sufficient funds to satisfy a chargeback, American Express bears the loss.

## THE INVESTIGATION

5. Between approximately July 2003 and August 2005, the defendant ARI GOODMAN, together with others, engaged in several schemes to defraud multiple individuals and American Express. The schemes involved the intentional failure to deliver and "upselling"[2] of cameras and camera equipment sold over the internet.

6. On or about May 12, 2002, the website www.cameraunlimited.com was registered to TierraNet, Inc., a domain name registrar, and paid for with the defendant ARI GOODMAN's Mastercard. On June 9, 2003, the website www.bestchoicedigital.com, was registered through TierraNet, and

---

[2] "Upselling" refers to the practice of using high-pressure sales tactics, including misrepresentations, to convince customers to upgrade equipment. The customers are then overcharged an amount significantly in excess of the actual retail value of the upgraded equipment. Often, upsellers simply send upgraded equipment or equipment which includes warranties which were not ordered and then charge the customer without the customer having authorized the upgraded transaction.

4

paid for with the defendant ARI GOODMAN's American Express card. Both websites, or domain names, were registered in the name of "Butch Mulan." Government and public records checks reveal no social security number or any other information for Butch Mulan.

7. On August 8, 2003, the defendant, ARI GOODMAN and a Camera Unlimited Employee (hereinafter, "Employee #1") opened a bank account at North Fork Bank. The defendant and EMPLOYEE #1 were the only authorized signatories on this account. The bank account was numbered 9364009283 and was in the name of Camera Unlimited (the "Camera Unlimited Account").

8. On August 13, 2003, the Camera Unlimited Account was established as a merchant account with American Express. Documents provided by American Express indicate that Employee #1 was listed as the person who established the merchant account.

9. I have interviewed Employee #1. Employee #1 stated that he started Camera Unlimited, which was also referred to as Best Choice Digital, along with the defendant. However, Employee #1 stated that he never opened the merchant account with American Express or authorized anyone else to use his name in opening the merchant account. Employee #1 stated that he worked at Camera Unlimited from 2003 to approximately January or February 2005. Employee #1 further stated that the defendant ran Camera Unlimited, which employed approximately 8 different

salesmen at various times during its existence. Employee #1 also stated that the defendant used the pseudonym "Jason Berg." Shortly after he left Camera Unlimited, Employee #1 indicated that another individual (hereinafter, "Employee #2") was hired.

    10. I have interviewed Employee #2. Employee #2 worked as a salesmen at Camera Unlimited, which was also referred to as Best Choice Digital, from in or about January 2005 through June 2005. Like Employee #1, Employee #2 stated that the defendant ran Camera Unlimited. Prior to leaving Camera Unlimited, Employee #2 indicated that he purchased and paid for some camera equipment from the company, which was never delivered. Employee #2 stated that the defendant refunded Employee #2's money through Employee #2's American Express card. As a result of this transaction, American Express froze Employee #2's American Express card, requiring Employee #2 to contact American Express to unfreeze the credit card.

A.   <u>The Camera Unlimited Fraud</u> *

    11. Camera Unlimited maintained a website at <u>www.cameraunlimited.com</u>. According to the website, Camera Unlimited sold cameras and camera equipment, as well as other types of video and recording equipment. I have interviewed several individuals who made purchases from Camera Unlimited. These individuals have informed me that Camera Unlimited

6

---

\* According to Documents on File with The New York Department of State, Department of Corporations, CAMERA UNLIMITED was located at 3409 Avenue S, Brooklyn, New York.

advertised prices well below the regular retail prices on many products.

    12. Several victims purchased items from Camera Unlimited. The victims paid for their purchases by check, wire transfer to the Camera Unlimited Account, or, in most cases, by using an American Express card. A condition of the merchant account agreement with American Express is that the merchant will not charge the cardholder's account until after the merchant has shipped the merchandise ordered. Individuals who ordered merchandise from Camera Unlimited were charged immediately for the item and shipping costs and received either nothing in return or a different item, of significantly lesser value, then what they had ordered. For example:

    a. In approximately July 2004, Victim #1 paid for eight Panasonic Pro Studio Editing VTR's at a price of $5,700 per unit. Victim #1's American Express card was charged a total of $47,513 by Camera Unlimited, but Victim #1 never received the merchandise. Victim #1 called the number listed for Camera Unlimited and spoke with one or more individuals who identified themselves at different times as "Ted," "Frankie," "Kevin," "Jason" and "Alex." Victim #1 eventually alerted American Express, who credited Victim #1's account in 2004. On or about July 25, 2005, Camera Unlimited charged Victim #1's American

Express card an additional $47,513, although Victim #1 had not ordered any additional merchandise. Victim #1 alerted American Express and Victim #1's account was again credited.

        b.    On March 15, 2005, Victim #2 purchased two cameras from Camera Unlimited. Victim #2 received the cameras, but was overcharged by approximately $2,890. In addition, the invoice listed the seller as Best Choice Digital. When Victim #2 called Camera Unlimited to complain about the overcharges, Victim #2 was informed that the extra charges were the result of an upgraded package that Victim #2 never requested. Victim #2 was told that Camera Unlimited would refund $250 to Victim #2. Victim #2 never received the refund. On August 4, 2005, Victim #2's American Express card was charged an additional $19,999.96 by Camera Unlimited although Victim #2 had not ordered any additional merchandise. Victim #2 alerted American Express, who credited VICTIM #2's account.

        13.    From the inception of Camera Unlimited's merchant account with American Express in August 2003 up to and including August 18, 2005, approximately $2.8 million was deposited by American Express into the Camera Unlimited Account. These funds purportedly represented the amount of American Express credit card sales processed by Camera Unlimited. Of that $2.8 million, more than $1.2 million was processed in a five-week period, from

approximately July 5, 2005 through August 10, 2005, including the transactions of Victim #1 and Victim #2 described above. American Express deposited the money into the Camera Unlimited Account. The funds were then withdrawn from the Camera Unlimited Account almost immediately after they were deposited. For example, on August 1, 2005, $220,307 was deposited by American Express into the Camera Unlimited Account. The next day, $220,700 was withdrawn from the Camera Unlimited Account. This pattern continued for approximately five weeks until the account was closed on August 18, 2005.

14. Because the Camera Unlimited Account was empty on August 18, 2005, American Express suffered a loss of over $1.2 million in uncollectible chargebacks to Camera Unlimited. This represented approximately 43% of the total amount of funds deposited by American Express into the Camera Unlimited Account from the time that account was opened until it was closed. For the period ranging from approximately July 5, 2005 through August 10, 2005, the amount of American Express' uncollectible chargebacks to Camera Unlimited represented approximately 99% of the total amount of funds deposited by American Express into the Camera Unlimited Account.

B. <u>The Best Choice Digital Fraud</u> *

15. On July 26, 2004, the defendant, ARI GOODMAN, and another employee (hereinafter, "Employee #3") opened a bank account at North Fork Bank. The defendant and Employee #3 were the only authorized signatories on this account. The bank account was numbered 9404012628 and was in the name of Best Choice Digital (the "Best Choice Digital Account").

16  On March 9, 2004, a merchant account was opened for Best Choice Digital in the name "Jason Berg." At some point thereafter, the Best Choice Digital Account became Best Choice Digital's merchant account with American Express.

17. Several victims purchased items from Best Choice Digital. The victims paid for their purchases by check or wire transfer to the Best Choice Digital Account, or by credit card. After the individuals paid for the item and shipping costs, they often received either nothing in return or something completely different, and of significantly lesser value, then they had ordered. For example:

a. On July 20, 2005, Victim #3 ordered two cameras, a tripod, and two eight-hour camera batteries from Best Choice Digital. The total price for Victim #3's order was $9,698.98. Victim #3 paid for this purchase by check. Victim #3's check was deposited in the Best Choice Digital Account.

10

\* According to bank statements associated with BEST CHOICE DIGITAL Accou BEST CHOICE DIGITAL was located at 2071 Flat Bush Avenue, Brookly New York

Victim #3 never received any camera equipment from Best Choice Digital. Victim #3 attempted to contact Best Choice Digital via the customer service number listed on Best Choice Digital's website, but received no answer.

        b. On April 22, 2005, Victim #4 placed an online order at www.bestchoicedigital.com for a camcorder. The price of the camcorder, with shipping, was $399.99. Victim #4 used a Visa card for the purchase. Approximately two months later, Victim #4's Visa statement indicated that $598.99 was charged by Camera Unlimited. Victim #4 never received a camcorder. Victim #4 was credited by Visa for the merchandise VICTIM #4 never received.

        c. VICTIM #5 placed an order for a camcorder online at www.bestchoicedigital.com. After completing the order, VICTIM #5 received a telephone call from Best Choice Digital advising that Best Choice Digital did not accept VICTIM #5's type of credit card. Ultimately, VICTIM #5 mailed a check dated July 18, 2005 in the amount of $1,023.06 to Best Choice Digital. VICTIM #5's check was deposited into the BEST CHOICE DIGITAL ACCOUNT. VICTIM #5 never received the camcorder. VICTIM #5 attempted to contact Best Choice Digital by calling the telephone number on www.bestchoicedigital.com, but no one answered the phone.

C.   The Flow of Fraudulent Proceeds

18.   On July 11, 2005, the defendant ARI GOODMAN and Employee #3 opened a bank account at JP Morgan/Chase Bank. The defendant and Employee #3 were the only authorized signatories on this account. The bank account numbered 091110881165 was in the name of Premium Photo (the "Premium Photo Account").

19.   Beginning in July 2005, the funds in the Camera Unlimited and Best Choice Digital Accounts were transferred, via wire transfers and checks, to the Premium Photo Account. On August 18, 2005 both the Camera Unlimited and Best Choice Digital Accounts were closed. The remaining funds in these accounts were transferred to the Premium Photo Account. In or about and between September and December 2005 there were no significant deposits into the Premium Photo Account. During this time period, approximately $400,000 was withdrawn from the Premium Photo Account and deposited into accounts controlled by the defendant and Employee #3.

20.   On or about August 18, 2005, the defendant, ARI GOODMAN, wrote a check to himself in the amount of $9,500 from the Premium Photo Account. On or about August 31, 2005, the defendant cashed two checks, each in the amount of $9,000, from the Premium Photo Account. On or about December 28, 2005, the defendant wrote a $500,000 check from the Premium Photo Account

12

to his wife, Miriam Husarsky. This check was deposited into Husarsky's personal bank account at JP Morgan/Chase Bank (the "Husarsky Account"). On or about February 7, 2006, $250,000 was transferred from the Husarsky Account into another JP Morgan/Chase Bank account held jointly by the defendant and Husarsky (the "Husarsky/Goodman Account"). On or about February 9, 2006, $250,000 was transferred from the Husarsky/Goodman Account to the Premium Photo Account. On or about March 3, 2006, the remaining $250,000 was transferred from the Husarsky Account to another account held at JP Morgan Chase Bank in the name of "Focus Photo, Inc." The defendant and Employee #3 were the only authorized signatories on the Focus Photo, Inc. account. The funds in the Focus Photo, Inc. account were ultimately transferred by wire, in smaller increments, back to the Premium Photo Account.

21. Based on the foregoing, I respectfully submit that probable cause exists to believe that the defendant ARI GOODMAN did knowingly and willfully devise a scheme and artifice to defraud, in violation of Title 18, United States Code, Section 1343.

WHEREFORE, your deponent respectfully requests that an arrest warrant be issued for defendant ARI GOODMAN so that he may be dealt with according to law.

                                                Special Agent Michael A. Petronella
                                                Federal Bureau of Investigation

Sworn to before me this
22_ _ _ _ _ _ _ _ _ _ _ 2007

TH_____
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK